## LEACH v. STATE.

### (*Knoxville.*　　October　20,　1897.)

1. CONTINUANCE. *Properly refused.*

    An application for continuance of a murder case, made at the second trial term, is properly denied, although the second term is a special term, where the affidavit fails to disclose the facts that the absent witness is expected to prove. (*Post, pp. 586, 587.*)

    Cases cited: Nelson *v.* State, 2 Swan, 482; Brown *v.* State, 85 Tenn., 442.

2. EVIDENCE. *Facts that sustain conviction of murder in first degree.*

    A conviction of murder in the first degree is sustained by evidence that defendant, before the crime was committed, predicted a secret murder of the deceased in the mode actually pursued; that he was in possession of the gun with which the fatal shot was fired shortly before the murder was committed; that he was loitering in the vicinity of the pathway usually taken by the deceased; that he made a full confession of having committed the crime, and that it was perpetrated for hire, and that he fled and concealed himself before he was accused, although he claims that the confession was made while somewhat under the influence of liquor, and he subsequently, when sober and imprisoned, denied its truthfulness. (*Post, pp. 587–594.*)

3. SAME. *Confessions.*

    That a confession was made by a party slightly intoxicated does not impeach its force or truthfulness, when the time, manner, place, and substance of the confession show deliberation and intelligence, and there is nothing to indicate that he was not in the fullest possession of his mental faculties at the time of the confession. (*Post, p. 594.*)

4. CHARGE OF COURT. *Refusal of inapplicable request is not error.*

    A request for an instruction which is not applicable to any theory of the case developed in the proof is properly refused. (*Post, pp. 594, 595.*)

Leach v. State.

5. MURDER. *Duress not a defense, when.*

One who has conspired with others to commit a homicide cannot set up as a defense to the actual commission of the homicide that if he had not committed the same he would have been killed by his co-conspirators. (*Post, pp. 594, 595.*)

6. SAME. *Opinion that does not disqualify juror.*

That a juror had expressed the opinion that any man who waylays and kills another ought to be hung, does not disqualify him to try a case of murder committed by waylaying, as to the particular facts of which he has no opinion, or means of forming an opinion. (*Post, pp. 595–597.*)

Cases cited and approved: Conatser v. State, 12 Lea, 436; Spence v. State. 15 *Ib.*, 539; Woods v. State, *ante*, p. 182.

7. SAME. *Mitigating circumstances.*

The trial Judge has discretion to overrule the jury's finding of mitigating circumstances and pronounce sentence of death for murder in first degree. (*Post, p. 597.*)

Code construed: § 7232 (S.); § 6098 (M. & V.); § 5257 (T. & S.).

Cases cited and approved: Greer v. State, 3 Bax., 322; Lewis v. State, 3 Head, 127; Mann v. State, *Ib.*, 374; Lancaster v. State, 91 Tenn., 268.

---

FROM ANDERSON.

---

Appeal in error from Circuit Court of Anderson County.   C. J. SAWYERS, Sp. J.

L. C. and E. E. HOUK for Leach.

Attorney-general PICKLE, J. A. FOWLER, and S. G. HEISKELL for State.

CALDWELL, J.   Mynatt Leach is under sentence of death for the murder of John D. Heck.   He

was indicted, tried, and convicted in Anderson County, where the crime was committed. The jury rendered a verdict, finding him "guilty of murder in the first degree, as charged in the indictment, with mitigating circumstances;" but the presiding Judge being of the opinion that no mitigation was disclosed, pronounced the sentence of death. There is an appeal in error. The case was continued at the first term on the application of the State, and tried at the second term over the objection of the defendant. The affidavit made by the defendant, in support of his motion for a continuance at the second term, disclosed no good reason why the case should not then be tried. Coming after the first term it was fatally defective, in that it failed to state the facts he expected to be able to prove, at the next term, by the several persons named as desired witnesses, and on account of whose absence alone he said the continuance was sought (*Nelson* v. *State*, 2 Swan, 482); and this is rendered none the less so by the fact that the second term was a special and not a general term. The rule of practice is well settled, and the Court is the better satisfied with its application in this case, because it was not shown, during the long trial below, nor on the motion for a new trial, by the affidavit of the defendant or otherwise, that anyone not actually present at the trial knew anything to his advantage. The failure of the defendant to the last to disclose some fact that those mentioned as absent witnesses would have proved had a contin-

uance been granted, and that they would prove, on a
new trial, "indicates clearly that they knew nothing
important to his defense." *Brown* v. *State*, 85
Tenn., 442.

Heck, the deceased, was business manager of the
Royal Coal & Coke Company at Better Chance, in
Anderson County. His residence was near the com-
pany's mine and store. On Wednesday, February
17, 1897, at about twelve o'clock, while going to
his dinner along a narrow pathway, and when within
a short distance of his home and only a few steps
from his wife, who was meeting him, a gun was
fired from ambush. The bullet passed through his
body from front to rear; he fell upon the ground
and expired almost instantly, without speaking a
word.

Two of the several persons who heard the re-
port of the gun, soon saw a man running rapidly
away from a large tree on the side of a hill, not
far from Heck's residence. Behind this tree, fresh
tracks of a man were found, and in front of it,
in line with the pathway upon which Heck was
walking, intervening twigs and branches of small
timber had been recently cut away. The eminence
and location were such that one standing behind the
tree, with the intervening twigs and branches re-
moved, could readily command a view of much of
Heck's usual way of travel from his place of busi-
ness to his home, including the point where he was
killed, which was two hundred and forty-seven feet

from the tree. That the homicide was deliberately planned and perpetrated by some one well acquainted with the topography of the place and the habits of the victim, and while lying in wait, and without warning or excuse, is established beyond the peradventure of a doubt.

The defendant had long lived in the community, and had many acquaintances and some relatives there, who had from time to time worked in the mine under Heck's control, or in that of some other company near by. Violent disagreements had occurred between employers and employes of these mines, but they seemed to have passed away, at least so far as outward appearances were concerned, before this tragedy was enacted, and it is not shown that the defendant, who had been a miner, ever had any open connection with them.

John Craig, who bore some relation to one of the mines on the side of the owners, was shot and killed while entering his own house at night, during one of the disagreements just alluded to. The act was committed clandestinely, by some person not then discovered, and never thereafter apprehended and brought to justice.

Mrs. Lucy Walton, who was a neighbor of Craig, and claims to have heard the report of the shot that took his life, testifies that the defendant, Mynatt Leach, some months after the death of John Craig, and before the death of John D. Heck, said to her that "Heck was watched every move he made, and

he would venture to say that the lead was already made to lay him over; he would go like Craig went, and that we would be running around to know who did it, and nobody would know.''

For some time before the killing of Heck the defendant resided with his brother, Wilburn Leach, whose house was not far from the home of Heck. During this time he was engaged in building a garden fence on the place for his brother. Wilburn Leach had in his house a Springfield rifle, which he had borrowed from his friend Andrews. On Wednesday, the day of the homicide, at eight o'clock in the morning, a daughter of Wilburn Leach saw her uncle, the defendant, take this gun up and walk out of the door with it, but whither he went, or for what purpose, she knew not. Between nine and ten o'clock he was seen without the gun, and near the entrance of the mine and store, by different acquaintances, who engaged in conversation with him about ordinary affairs. Later on, and before noon, he was observed by others, with a gun, at a spring not far from the fatal spot. At half past twelve he returned to his brother's house unarmed, and, without sitting down to partake of the noon repast that had been saved for him after the family had eaten and dispersed, took a biscuit in his hand, and, while eating it, walked out to the garden fence, in whose construction he had been engaged previously. After a little while he left the work and went to a mine in which his brother, Wilburn, was employed,

sought and had a private conversation with him, and then proceeded, on foot, six or seven miles away to the house of his brother, Calvin, where, after reporting that Heck had been killed, he spent the night. In the forenoon of the next day, Thursday, an unloaded Springfield rifle was found in some bushes, ten or fifteen steps from the large tree by which Heck's assassin undoubtedly stood when the deadly shot was fired. This gun was shown to be the same one taken by the defendant out of the house of his brother, Wilburn, on the morning of the day before, and it was a suitable caliber for the bullet that perforated the body of Heck, and, traced by its mark on the ground and on a fence, was found some distance beyond. The defendant went away from his brother Calvin's house Thursday morning, but returned about noon and remained there until the next morning. At a late hour Thursday night, when Calvin had gone from home, and his children were asleep, and no one was present in the room but Calvin's wife and the defendant, and when she had, by his request, made the situation the more secret by pulling down the window shades, he voluntarily confessed to her that he was the perpetrator of the crime, and related some of the details. Testifying at the trial, she said: "I asked him if he knew anything about the killing of Heck, and he said he did. I asked him what it was, and he hummed and hawed a little, and then he said he was the man that killed him; he was the man that fired the shot.

Leach *v.* State.

I said 'Why did you do that?' and he said he was hired to kill him, there was money in it. He said he was standing behind a tree. He said Mrs. Heck was coming to meet her husband, and he said that he came very near backing out, and that it was kill or be killed. He said there was a man standing above him at a tree. He didn't say anything about what the man was going to do. It was kill or be killed."

Mrs. Leach further testified that the defendant, in the same conversation, told her that three men saw the shooting, and that when it was done he threw his gun down about five steps from the tree and ran in one direction, while the other two ran in another direction; and that he indicated to her that he had received a purse of $200, to which a sufficient number of persons in the neighborhood of the mines had contributed $10 each. She further said, on cross-examination, that the defendant was somewhat intoxicated at the time of his confession, and that after his arrest and incarceration he told her that what he said in the confession was untrue.

On Friday morning following the homicide and the confession to Mrs. Leach, the defendant went from his brother Calvin's house to a place of hiding on the side of a hill, and there spent the day, having his dinner sent to him. While in the secret place his young niece, Calvin's daughter, saw in his possession what she took to be a large amount of paper money. He cautioned her to say nothing about

it, but she went to the house and told her mother
what she had seen. At nightfall he returned to Cal-
vin's home, and there remained until Saturday morn-
ing, when, after an unsuccessful effort to escape, he
was arrested for Heck's murder. The defendant's
palliative statement that "it was kill or be killed"
was intended, presumably, to impress his sister-in-law
with the idea that one of his co-conspirators on the
scene was ready to take defendant's life if he re-
ceded from his purpose to kill Heck.

Two witnesses, Amanda Rose, colored, and Mrs.
Redman, "half Indian and half white," heard the re-
port of the murderer's gun at distances of five hun-
dred and six hundred and fifty feet, respectively, and
saw him run from the large tree. Amanda Rose
said that she did not know the defendant, and did
not recognize the fleeing man, though she might have
done so had she been acquainted with him. Mrs.
Redman said that she saw the defendant but a short
time before the homicide, with a gun, at a spring
and in some bushes near the large tree; that she
saw him at those places when at the spring herself
for water, and when on the side of the hill to get
herbs for a sick man; that his conduct was such as
to attract her particular attention, and that after re-
turning to her home, which was six hundred and
fifty feet from the large tree, she looked back and,
in a little while, saw him fire the fatal shot, and
then throw his gun down and run rapidly away.
This witness fully identified the defendant in a crowd

after his arrest, and again on the trial in the Court below. Such, in brief, are the salient parts of the State's evidence.

The defendant introduced only two witnesses, Mrs. Wilburn Leach and Vina Leinhart. They testified that Mrs. Redman told them, voluntarily, a short time before the trial, that two persons, active in the prosecution, had approached her "three or four different times and tried to get her to tell something about it (the murder), and she told them she didn't know anything about it, and they told her that they had come to lynch her if she didn't tell; and she said they had the things to lynch her with, and she told him that it was a tall white man, but she didn't know who it was—had never seen him before;" and that one of them "took her and showed her Mynatt Leach, and she said that was the first time she had ever seen him."

Mrs. Redman denied that she had ever made the statements attributed to her by the defendant's witnesses, and said that she did not recollect any conversation with them.

It is difficult to conceive of a stronger case of guilt than that established against the defendant by the proof in this record. A circumstantial prediction of a secret murder, followed by the perpetration of exactly such a crime, recent possession and unexplained desertion of the deadly weapon used, suspicious loitering in the vicinity of the victim's well-known pathway to his home, positive incrimina-

15 P—38

tion by the consistent statement of an eye-witness, a full and free confession of the deed, and that it was perpetrated for hire, an injunction of secrecy as to money accidentally discovered in his possession, careful hiding before accused; what more could be required or shown in any case?

It is a vain impeachment of the defendant's confession to say that it was made when he was somewhat under the influence of whisky, and that, subsequently, when sober and imprisoned, he firmly denied its truthfulness. There is no proof or indication that he was not in the fullest possession of his mental faculties at the time he confessed his guilt; on the contrary, the manner, time, place, and substance of the confession show deliberation and intelligence on his part. That the confession was unwise, and the subsequent denial more consistent with his desire to save himself from the consequences of his crime, can hardly be doubted. But slight intoxication could not impair the force or truthfulness of the confession made. Such a condition is not likely to render one false. *In vino veritas.*

The Hon. C. J. Sawyers, who presided as Special Judge at the trial, gave the jury a clear, accurate, illustrative, and comprehensive charge. Of it no complaint has been made. It is assigned as error, however, that he declined to give an instruction requested by the defendant's counsel. That instruction is in these words: "If the proof shows that the

defendant, Mynatt Leach, entered into a conspiracy to kill John D. Heck, but afterwards abandoned his purpose, and was forced to kill him in order to save his own life, he would not be guilty of murder in the first degree."

This proposition was applicable to no theory or phase of the case developed in the proof, and, for that reason, if no other, the Court's declination was right. There was no evidence that the defendant abandoned his deadly purpose towards Heck, or that he was forced to kill him to save his own life. It is true that he said in his confession that he "come very near backing out, and that it was kill or be killed," but that statement did not justify the instruction requested. It imports neither an abandonment of his purpose to take Heck's life nor the use of force to compel its execution. If it be true that one of his co-conspirators was near by with a gun and in a threatening attitude toward the defendant, as the confession may indicate, that would work no diminution of his offense. In such a case, if in fact a real one, it was his duty to spare Heck, and at the same time protect himself by turning his weapon upon his threatening confederate. He could not, with any degree of legal palliation, elect a course absolutely safe to himself, and slay an innocent man, rather than take some risk to himself in an equal combat with a relentless companion.

On the motion for a new trial an effort was made to show that James Craig and William Beets,

two of the jurors who participated in the trial of the case, had, before becoming jurors, formed and expressed opinions unfavorable to the defendant. The trial Judge heard the testimony of all the witnesses offered on this subject, and, after considering the same, overruled the motion. His action in so doing is now complained of as erroneous.

The clear preponderance of the testimony on this subject is to the effect that, some three weeks before the trial, William Beets and several other neighbors were on a visit at the house of James Craig, and that while there they engaged in conversation about three or four recent murders in the neighborhood, and, without the mention of a single fact as to any one of them, expressed the general opinion that any man who would waylay and shoot another ought to be hung. The attacked jurors concurred in that opinion. The weight of the evidence, however, is with them in the insistence that the murders of Craig and Hackworth and McCoy were those referred to, and that the name of Heck was not mentioned, and, consequently, that the opinion expressed could have had no direct reference to him. But if it had referred to him, and him alone, as some of the witnesses say, the jurors would have been competent, nevertheless. The expression of a general opinion that a man who will waylay and kill another ought to be hung works no disqualification. To be disqualifying, the opinion must be as to the guilt or innocence of the particular person charged, and must

be based upon personal knowledge of the facts of the case, or upon a statement of the facts made by the witnesses, or by some one who has heard the witnesses relate them. *Conatser* v. *State*, 12 Lea, 436; *Spencer* v. *State*, 15 *Ib.*, 539; *Woods* v. *State*, *ante*, p. 182. It is not disclosed, or even intimated in this record, that the jurors, Beets and Craig, or any other person engaged in the conversation at the house of the latter, knew, or had heard, or undertook to state, any fact touching the guilt or innocence of the defendant in this case. It follows, therefore, that those jurors could not properly have been held to be disqualified under any view of the evidence produced on the motion for a new trial.

The jury's finding of "mitigating circumstances" devolved upon the trial Judge the important duty of deciding whether the defendant should suffer the death penalty or undergo imprisonment in the State prison for life. Whether the one sentence or the other should be pronounced was a matter of legal discretion with him. Code, § 5257; M. & V., § 6098; Shannon, § 7232; *Greer* v. *State*, 3 Bax., 322; *Lewis* v. *State*, 3 Head, 127, 150; *Mann* v. *State*, *Ib.*, 374; *Lancaster* v. *State*, 91 Tenn., 268, 290.

Being of the opinion that the proof disclosed no mitigation of the crime, he rightfully pronounced the sentence of death; and this Court, concurring in that opinion, affirms the judgment.