IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2010

**STATE OF TENNESSEE v. JAMES TODD**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-00075    James M. Lammey, Jr., Judge**

---

**No. W2009-01475-CCA-R3-CD  - Filed January 12, 2011**

---

Defendant-Appellant, James Todd, was convicted by a Shelby County Jury of one count of attempted first degree murder, a Class A felony, and one count of aggravated assault, a Class C felony.  Todd received a twenty-five-year sentence at thirty percent for the attempted first degree murder conviction and a consecutive ten-year sentence at thirty-five percent for the aggravated assault conviction, for an effective sentence of thirty-five years in the Tennessee Department of Correction.  On appeal, Todd argues that (1) the trial court erred in denying his motion to suppress his statement; (2) the trial court erred in allowing the victim to testify at trial that she previously identified Todd as the perpetrator at a prior hearing; (3) the trial court erred in admitting unauthenticated and unfairly prejudicial photographs at trial;  (4) the trial court erred in adding language to the jury instruction on duress; (5) the evidence was insufficient to support his convictions; and (6) the trial court erred in imposing an excessive sentence.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert W. Jones, District Public Defender; J. Mark Alston, and Michael J. Johnson, Assistant Public Defenders, Memphis, Tennessee, for the Defendant-Appellant, James Todd.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy E. Wilbur, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacey M. McEndree, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Suppression Hearing.** Robert Wilkie, a detective with the Memphis Police Department, testified that in June 2006 he was assigned to the case involving the attack of Paula Fowler and her three-year-old son. Detective Wilkie stated that Lieutenant Mark Mitchell of the West Memphis Police Department notified him that Todd, the Defendant-Appellant, was willing to talk to him regarding the case.

On August 22, 2006, Detective Wilkie drove to the West Memphis Police Department and observed Todd standing at the front of the station smoking a cigarette. He asked if Todd would be willing to come the Memphis Police Department so that he could ask him some questions, and Todd agreed. Todd said that he was concerned about not having a ride home to West Memphis, and Detective Wilkie assured him that he would have a ride back home if he needed one. Todd rode in the front seat of Detective Wilkie's unmarked police car back to Memphis and was not handcuffed.

Upon arriving at the Memphis Police Department, Detective Wilkie took Todd to an interview room on the eleventh floor. Detective Wilkie and Todd sat in silence for approximately five or ten minutes until Lieutenant Miller entered the room. At that point, Detective Wilkie did not immediately advise Todd of his Miranda rights. Detective Wilkie first asked Todd if he had known Charles Fowler. Todd explained that he had known Charles because he was a friend of Charles's brother, Sam. He said that he did not know what had happened to Charles's family other than the fact that Charles had committed suicide. Detective Wilkie testified that Todd was not under arrest and was free to leave at that point during the interview. He further testified that Todd never stopped talking and never informed him that he wanted to be taken home to West Memphis.

During the interview, Detective Wilkie informed Todd that Charles Fowler's wife, Paula Fowler, and their three-year-old son had been attacked, and his name had "come up in the investigation." He showed Todd some photos from the crime scene, which included broken bricks and blood on the walls and the floor. He asked Todd to consent to give him a DNA sample so that he could be eliminated as a suspect. Todd initially refused to give a DNA sample. However, when Detective Chatman walked into the room with a warrant to obtain a sample of Todd's DNA, Todd "almost simultaneously" consented to the DNA sample. Detective Chatman served him with the warrant, and Todd signed the consent form to provide a DNA sample. Detective Wilkie said that they took a break, and he asked Todd if he needed anything to eat or drink or if he needed to use the restroom. During this fifteen-minute to twenty-minute break, Detective Wilkie said that Todd was not handcuffed or shackled. He also said that he recalled that the door to the interview room was open.

Following the break, Detective Wilkie provided Todd with an advice of rights form regarding his Miranda rights. Todd read this form aloud and signed it. Todd also indicated

that he understood his rights and wished to talk to the officers. Detective Wilkie and Lieutenant Mark Miller, who was present, also signed the form. Detective Wilkie informed Todd that they were giving him an opportunity to tell them what happened before the DNA results came back because once his DNA linked him to the crime they would not ask him any more questions about what happened. Todd immediately responded, "Well, how much time do I get?" Detective Wilkie told Todd that sentencing was "lawyer stuff" that the officers did not determine. Then Todd, who was still holding the crime scene photographs, dropped his head and said, "Okay, I did it." Detective Wilkie asked Todd to tell him what happened. During his verbal statement, Todd never stated that he wanted to stop talking and never indicated that he wanted to leave. After Todd gave the verbal statement, Lieutenant Miller left the interview room. Detective Chatman and Detective Wilkie were present when Todd subsequently provided his formal, written statement. The written statement, which consisted of Detective Wilkie typing his questions and Todd's answers, started at 12:49 p.m. and was read and signed by Todd at 1:40 p.m. During this time period, Detective Wilkie stated that he never made any threats or promises to Todd in exchange for his statement. In addition, he stated that Todd never asked to speak with an attorney during the interview process. Detective Wilkie said that Todd was not under arrest at the time that he and Todd signed the advice of rights form; however, Todd was under arrest after he gave his statement of admission. The first time that Todd was handcuffed or restrained in any way was after he had signed his written statement and as the officers were preparing the charging documents. Detective Wilkie stated that Todd never indicated that he did not understand what was happening. In addition, he stated that Todd never told him that somebody else had threatened to hurt him if he did not commit the offenses. Detective Wilkie said that if Todd had never talked to him about what happened, he would have made sure that Todd was taken back to West Memphis. Detective Wilkie said that no tape or video recording was made of Todd's statement in accordance with police policy.

Detective Jerry Chatman testified that he assisted Detective Wilkie in taking Todd's typewritten statement on August 22, 2006. He was present during Todd's questioning and observed Detective Wilkie typing his questions and Todd's answers for the written statement. Detective Chatman said that he also retrieved a search warrant to obtain a sample of Todd's DNA. He stated that the only people present were Todd, Detective Wilkie, and himself at the time that the written statement was being typed. Detective Chatman said that Todd's statement was taken in a small interview room and that Todd was not handcuffed or restrained in any way. He said that Todd never indicated that he did not understand his Miranda rights prior to giving his written statement. He also said that Todd never said that he wanted to stop talking during the written statement. He further stated that he and the other officers never threatened or promised Todd anything during the interview process and that Todd never asked for an attorney. Detective Chatman stated that he observed the entire written statement and saw Todd read, initial, and sign the statement.

Todd testified that on August 22, 2006, a West Memphis police officer informed him that a Memphis detective wished to speak with him. Todd said that he went to the West Memphis Police Department and approximately thirty or forty minutes later Detective Wilkie arrived and asked him if he was willing to ride over to the Memphis Police Department to talk to him. Todd agreed, and Detective Wilkie said that he would make sure that he had a ride back to West Memphis if he needed one. Todd said that he did not feel as though he were under arrest at the time that he left West Memphis with Detective Wilkie.

Todd stated that when they arrived in the interview room at the Memphis Police Department, the officers "shackled" his right leg to the floor prior to any questioning. Detective Wilkie told him that this restraint was police procedure. Initially, he and Detective Wilkie were in the interview room alone, and Detective Wilkie showed him some photographs. Detective Wilkie then left to get Todd a cigarette and returned with two more officers, including Detective Chatman. The officers asked Todd for a blood sample, which he initially refused. However, once the officers returned with a warrant for a DNA sample, Todd consented to provide a DNA sample.

Todd said Detective Wilkie asked him if he had known Charles Fowler, and Todd responded that he had known Charles through Charles's brother, Sam Fowler. Todd said that Detective Wilkie did not advise him of his rights at that point. Todd said that other than knowing Charles Fowler through Sam, he "didn't know nothing." Todd acknowledged that he never told Detective Wilkie that he did not want to talk to him about Charles Fowler.

Todd stated that Detective Wilkie took a break and then came back in the interview room with Detective Chatman. The detectives began asking Todd if he knew Charles Fowler's wife and son, and Todd responded that he did not know them. Todd said that the detectives told him that if he would not agree with them that he would "get a hundred years from the judge" and that his statement "could help" him regarding sentencing. Todd told the detectives that he did not know anything about the case.

Detectives Wilkie and Chapman took a break. When they returned, they were accompanied by another officer who obtained the DNA sample from Todd. Todd said that the detectives never told him that he had the right to remain silent or the right to an attorney. However, Todd admitted that he agreed to speak with Detectives Wilkie and Chapman.

Todd claimed that he did not see the advice of rights form until after he was arrested. Also, Todd said that he was unsure whether he signed the advice of rights form before or after he gave the formal, written statement. Todd acknowledged that he provided the words that were in his written statement. He further acknowledged that Detective Wilkie typed his question and then typed Todd's answer to that question. Todd said that he was able to read

the question and his answer as Detective Wilkie typed it. He said that he did not read the statement before he signed it because he had given "them the statement already." Todd said that he was not told he was under arrest until after he gave his statement. He claimed his Miranda rights were never read aloud to him prior to him giving his statement. He said that he never asked for a lawyer because "he never had that opportunity." He also claimed that he was never told that he had a right to an attorney.

Todd stated that his leg was shackled for the entire interview process except for when he asked to use the bathroom. Detective Wilkie and Chapman and another officer took him to the restroom and shackled his leg again when he was returned to the interview room. Todd acknowledged that the advice of rights form informed him that he was under arrest, that he had a right to a lawyer and that if he did not have money, an attorney would be appointed for him, and that everything he said could be used against him in a court of law. However, Todd claimed that he was not advised of these rights until after he had given his statement. However, Todd acknowledged that he had been arrested before and had been advised of his rights in those previous, unrelated cases.

At the conclusion of the hearing, the trial court found Todd's testimony to be "unbelievable" and "totally incredible." It did not believe that Todd was shackled to the floor in the interview room. The court also found that Todd gave his statement freely and voluntarily and that it saw nothing in the proof that Todd had ever indicated that he wanted to speak with an attorney. For all of the aforementioned reasons, the trial court refused to suppress Todd's statement.

**Trial.** Sandra Waldo testified that on June 18, 2006, she was dating Charles Fowler, and they had a sixteen-month-old child together. Waldo stated that she and Charles[1] had been dating for four years at that time, and they lived together at the Ridge Apartments in West Memphis. As of June 18, 2006, Waldo, Charles Fowler, and their son had been living at their apartment in West Memphis for approximately one month. Waldo said that she discovered that Charles was married shortly after they started dating. However, she continued to date him because he told her that he did not consider himself married since his wife refused to give him a divorce.

Waldo said that she was angry at Charles the week of June 18, 2006, because he was never home. On Saturday, June 17, 2006, the day before Father's Day, Waldo went into her living room and saw Charles and another man, who she had never met, sleeping on the floor and the couch. Waldo woke Charles, took her son outside to play, and saw Charles and the

---

[1] We will occasionally refer to Charles Fowler, Paula Fowler, and Ashley Fowler by their first names in order to easily distinguish them in this opinion. We mean no disrespect by this practice.

other man leave the house about ten or fifteen minutes later. She said that the man that was in her living room on June 17, 2006, "could be" Todd, the Defendant-Appellant in this case.

Waldo said Charles and Todd returned to the apartment for lunch. Todd was playing a game with her son while Charles ate a sandwich. Charles introduced Waldo to Todd, and she "assumed they were friends." She said they stayed at the apartment for less than an hour before leaving in Charles's truck.

Charles returned to their apartment alone at approximately 9:00 or 10:00 p.m. that night and immediately went to bed. She did not recall seeing Charles on Sunday, Father's Day. Waldo learned that Charles Fowler was deceased on Monday at around 5:00 p.m.

Anthony Gossett testified that he lived "[r]ight around the corner" from Charles Fowler and Waldo. He said that he was aware that Charles was an "[o]fficer." He recalled seeing Charles and another man around noon on June 18, 2006 at Gossett's home. He stopped to talk with them for a few minutes, and the man with Charles Fowler asked him for a cigarette. Gossett said that he was sure that Todd was the man with Charles that day because he knew "him by the eyes." Todd asked him if he could step inside his house to use the restroom while Gossett got the cigarette for him. Gossett said he "kind of got spooked" and told him to urinate on the side of his house. He did not want to let Todd inside his home because he did not know him and because he was with Charles, who was a police officer. Gossett also noticed that Charles had a large screwdriver under his shirt. He talked to the two men for a few minutes before Charles indicated to Todd that it was time to leave. Then Charles and Todd walked down the street towards Charles's home.

Morgan Myers, who was eleven years old at the time of the crimes in this case, testified that she lived on a street "right across the street" from the victims' house on Ruskin Street. On the afternoon of June 19, 2006, Myers stated that she was driving to the grocery store with her parents. As they were leaving, Myers saw "a man walking up the driveway" of Paula Fowler's house across the street. She said that she noticed the man because "he was wearing a jacket, and [she] figured it was a little hot outside to be wearing a jacket." The man "had his hands in his pocket[s], and he was looking down." She also noticed that the man, who was alone, was walking "rather slow" and "hesitantly." Later that night, Myers saw "police cars and ambulances and a crowd at the house." Myers then identified Todd as the man she saw walking up the driveway of Paula Fowler's home.

Paula Fowler, one of the victims in this case, testified that she had been married to Charles Fowler for five years, and they had a son, who was three years old in June 2006. She said that Charles was an officer with the West Memphis Police Department. At the time of the offense, Paula and their son were living on Ruskin Road in Memphis, and she and

Charles had been separated for four months. Paula stated that approximately one week before Father's Day 2006, Charles told her that he had been deployed to Iraq. She said that she "took him to the Armory in West Memphis because [Charles] said he was going to be deployed." Charles left his 2003 Chevy Avalanche at her house at the time.

She saw Charles again at his mother's house two days before Father's Day as she was bringing their son to spend some time with Charles Fowler's mother. As she was driving down the street, she saw Charles working on his brother's car. She said she "was shocked because we made eye contact and he . . . tried to run and hide underneath the car." Paula said that she was not aware that Charles was still in the country. She "called him a liar" and then left. She explained that she was "[u]pset" and "hurt" because of his actions. When she arrived at home, she "took a hammer[] and . . . banged the front of his truck." She then parked the truck "around the corner" because she did not want it in her yard. Shortly thereafter, the truck was gone. Paula said she never saw Charles Fowler again.

On Saturday, June 18, 2006, the day before Father's Day, Paula said that she took her son over to his paternal grandmother's house for her to keep him until Sunday. Paula said that when she married Charles Fowler, she was aware that Charles had a daughter, Ashley Fowler, from a previous relationship. However, she discovered that Charles had another son, who was two years old, the Friday before the offense occurred. On Sunday at 4:00 p.m., Paula visited with Charles's mother for about thirty minutes and then took her son to her father's house to celebrate Father's Day. After seeing her father, she and her son went home. Upon arriving at her house, Paula noticed that the latch on her side gate was "undone." She did not pay much attention to this because her son would sometimes play with the latch. She picked up her son, who was asleep, and went in the front door of her home. She walked upstairs to her son's room and placed him on his bed. As she was headed downstairs to lock the front door, she saw a man, who she later identified as Todd, wearing a mask and white surgical gloves with the fingers cut out standing behind the door to her son's room. Todd's mask consisted of a nylon stocking that covered "his mouth to his chin and tied in the back." However, the mask did not cover his nose, eyes, or forehead. She stated that she had never seen Todd before and recalled that he was wearing a "striped white shirt" and white shorts, white socks, and white tennis shoes. She said that it was still light outside, and she was able to see Todd clearly because she was only a couple of feet away from him. Todd did not say anything to her but blocked the doorway so she could not run out of the door. Paula started screaming, and Todd "had a big landscaping stone in his hand, and he . . . hit [her] in the back of [her] head." She said that the stone was approximately ten inches in diameter. As Todd was hitting her in the back of the head, Paula was "face-to-face" with him. Paula said that Todd hit her without stopping "approximately forty times." She was "crying and screaming and trying to protect [her] head." Paula said that she was very afraid that she was going to die in front of her son. In addition, "[b]lood was dripping and running down [her]

-7-

hair – down [her] back – blood [was] just running everywhere." At the time, Paula could see her child "crying [and] reaching out to [her]." She said that the attack lasted for approximately five minutes. She said that she never heard Todd's voice, and she never heard anyone else's voice in her house that day, other than her son's crying. She also never saw or heard anyone else in the house during the attack.

Paula said that her son woke up during the attack and began to tug on Todd's leg. Todd stopped hitting Paula and hit her son three times in the head. After the third hit, her son fell to the ground. After her son fell, she said that she wanted to jump on Todd's back, but she was too weak. Paula fell to the floor herself and said, "I'm dying – I'm dying." Todd did not react. She stayed on the floor with her eyes "semi closed" so that her eyes appeared closed, but she could still see Todd in the room. Paula said that as she was pretending to be dead, Todd kneeled down and put his hand on her back for a few seconds. Todd then picked up the rock fragments scattered on the ground and she heard him walking down the stairs and out the back door. Paula heard only one set of footsteps. Once she was sure Todd had left the house, she described what happened next:

> I got up. I looked over at my son. I wanted to pick him up, but I knew I didn't have the strength to pick him up. And so I went downstairs. And as I was going down the stairs, I touched my hair, and I could just feel all the blood dripping down my hair. And I just touched it and felt all of the blood just running down . . . and I . . . ran out [of] the door[.]

Paula exited her front door, and she fell down in the grass by her mailbox. Her neighbor, who was standing on his front porch, ran over to help her. A few minutes later, her son ran out of the front door yelling, "Mommy, Mommy." The child was bleeding from his head, and he had blood on his clothes and shoes.

Following the incident, Paula woke up in the intensive care unit of the hospital. She had a cast on her left arm, and her head was "bandaged up." She stayed in the hospital for four days and had follow-up care for at least six months. Once her bandages were removed, she noticed that her head had been shaved, and she "had stitches and staples . . . all over [her] head [in] different places." She also had a scar on her left eye.

Paula first saw her son, who was also in the intensive care unit, two days after the incident. She said that her son had stitches in the top, middle, and very back of his head, and one of his eyes was bloodshot.

In June, a detective showed her a photo spread containing several individuals. However, she did not identify anyone in that first set of photographs as the perpetrator. Paula

later discovered that Todd's photograph was not in the first photo spread. Paula was shown a second photo spread in August. She stated, "One [of the photographs in the second photo spread] looked familiar, but I wasn't quite sure at that point. One stood out more than the other ones[,] but I wanted to be 100 percent sure that [the individual in the photograph] was the person [who committed the crimes]." She was unsure because the person in the photo spread had facial hair, and her attacker did not have facial hair at the time of the offense.

On November 9, 2006, Paula appeared in General Session court for a hearing related to this case, although she did not testify. Defense counsel then objected to this line of questioning because her testimony constituted "an in-court identification." Once the trial court determined that this testimony was admissible, Paula continued her testimony and stated that she identified Todd as the perpetrator at the November 9, 2006 hearing in General Sessions in which she did not testify. She said that no one pointed Todd out to her or identified him in any way during the hearing. Upon seeing Todd, she felt "angry" and "kn[e]w exactly who he was." She stated that she knew Todd was her attacker because of "[h]is face. His features. His eyes – especially his eyes. His nose. His chin. His facial structure." She acknowledged that she was not comfortable making an identification from a two-dimensional photograph; however, she said that once she saw him in person at the hearing, she was "[o]ne hundred percent" sure that Todd was her attacker. She later saw Todd at another pre-trial hearing, in which she testified and identified him as her attacker. She also identified Todd as her attacker at trial.

Jimmy Stokes testified that he lived across the street from Paula Fowler and her son in June 2006. On the Friday night before Father's Day, Stokes saw Paula hitting Charles Fowler's truck with a hammer while talking on her cell phone. Approximately forty-five minutes later, Charles Fowler arrived and parked his truck in a "cove" near Stokes's home. Charles then walked away from his truck and returned alone in a "dark blue Bonneville" with tinted windows. He looked at his truck again and appeared "real[ly] angry." Stokes said that Friday night was the last time that he saw Charles's truck in his neighborhood.

Stokes next saw Charles Fowler and another man, who had never seen before, on Saturday. He said that Charles and the man went into Paula Fowler's house for a short time at 10:00 or 11:00 a.m.. He said that they left for a short time and then they came back and re-entered the house. Then they left the house a second time. Both times, Charles Fowler and the man were riding in a Pontiac Bonneville. Stokes said that Paula Fowler and her son were not present during these two incidents.

Stokes said that on the following day, which was Father's Day, he was preparing to eat dinner when he saw Paula Fowler and her son arrive at her house and go inside.

A short time later, Stokes's wife noticed that Paula had fallen down in her front yard. Stokes and his oldest son immediately walked over. He said Paula Fowler was "very bloody" with blood on her head and her side. When they reached her side, she mumbled, "He hurt my baby – can you help my baby." Stokes said that he did not want to go into the house, but a few minutes later Paula's son came to the front door, and Stokes encouraged him to come outside. He said that the child also had blood from his head to his bottom. Stokes instructed his wife to call 911.

Dr. George Maish, III, a trauma surgeon at The Med hospital in Memphis, testified that he was working when Paula Fowler arrived. Paula was "admitted with complex stellate laceration to the back of her skull with part of the scalp missing." A Cat Scan later revealed that she also had a "subarachnoid hemorrhage," which means that she had some bleeding on the surface of the brain." Dr. Maish said that Paula had a six-centimeter laceration on the back of her head, a three-centimeter laceration nearby, and a small laceration over her eye. She also had a "stellate" or "star shaped" laceration, which consisted of a five-centimeter laceration with a three-centimeter laceration through it. Paula had also sustained a hand fracture which did not require surgery. The hospital admitted Paula in critical condition.

Ashley Fowler, Charles Fowler's seventeen-year-old daughter from a prior relationship, testified that her father died on June 19, 2006. She stated that, at the time of her father's death, he was married to Paula Fowler and that he and Paula had one child, who was three years old. Ashley stated that her father "had different lives that he lived" with different women other than his wife. She confirmed that her father's girlfriend at the time that he died was Sandra Waldo and that her father and Waldo had a child together. Ashley said that she had seen Todd with her father at her grandmother's house and in her father's truck. Her father introduced Todd to her as "E." She said that there did not seem to be any animosity between her father and Todd. However, she said, "[I]t seem[ed] like they were . . . plotting something maybe." She added, "I remember one of them saying something about doing something for me or something like that." She stated that she saw Todd in her father's truck "not that long before I saw him on the news again, and that's when I – it kind of dawned on me that [he] was the same person."

On June 18, 2006, Ashley Fowler stated that she had eaten at a restaurant and was returning home when she saw police cars surrounding the house her father shared with Paula Fowler. She said that approximately a week prior to Father's Day, her father typed a letter falsely claiming that he was being deployed to Iraq. After being taken to an army base, her father showed up at her grandmother's house. When the family said that they thought he was leaving the country, he replied, "No, I'm not going nowhere." She said that this was the last time she saw her father.

Following the incident, Ashley visited Paula Fowler and Paula's son many times. She stated that as a result of his injuries, Paula's son has "permanent marks" or scars on his head where his hair will not grow.

China Taylor testified that in 2006 she was living with her boyfriend, Todd, in West Memphis. Taylor said that Todd was not employed in June 2006, and she "was taking care of him." She said that Todd commonly went by his middle name, Edward. Taylor said she knew Charles Fowler because Todd was a friend of Charles's brother, Sam. She remembered seeing Charles Fowler pick up Todd in a white truck. She said that although they left in the truck, Todd walked back to her house an hour later. After the attack occurred, Taylor said she saw Todd "pacing from Big Pete['s] house to [her] house looking for Charles Fowler." She stated that Todd told her, "I'm waiting on him to come back [so that] he can pay me." Todd said that Fowler owed him $250 for "moving furniture or something." Charles Fowler did return, although he did not have the money, and he was later found dead. Todd told Taylor that Charles had made him hit Paula Fowler with a brick and that Charles had him at gunpoint in a closet in the child's room. Todd claimed that Fowler told him if he did not kill the woman and her child then Fowler was going to kill him. Todd claimed that he told Paula Fowler, "Don't worry about it, I'm not going to kill you." Todd told Taylor that he could not kill Paula Fowler because of his "conscience."

A.J. Pounds, an officer with the Crime Scene Investigations unit of the Memphis Police Department, testified that he was called to the Paula Fowler's address on June 18, 2006. He took numerous photographs inside and outside the residence. As he approached the house, he noticed a bloody towel in the front yard and blood around the front door of the house. He went up the stairs and noticed several areas of "blood spatter and blood." Once he arrived at Paula's son's bedroom, he noticed a brick on the floor and "assorted blood spatter." Because one photograph could not accurately depict the child's room, Officer Pounds stated that exhibits 9 and 10 showed the left and right sides of the room. He identified "blood spatter on the wall and the shade of the window next to the bed." He said that some of this blood was as high as six feet from the ground. In addition, there was a large area of blood spatter at the bottom portion of the child's bed. Exhibit 13 showed placards set out by Officer Pounds that identified several pieces of evidence in the room. Exhibit 14 showed a close-up view of Paula Fowler's earring on the floor. Exhibit 15 showed a piece of brick and pieces of hair from Paula's scalp. Exhibit 16 showed a close-up view of the strands of hair. Exhibit 17 showed a rock and a nylon stocking. Exhibits 18 through 22 showed pieces of brick and various strands of hair. Exhibit 29 showed a nylon stocking that was found in Paula's backyard. Exhibit 34 showed a brick that had "dents or areas that had been chunked out or torn away." Exhibits 37 and 38 showed pictures of footprints in the backyard. Exhibits 35 and 36 showed the dental stone casts of the footprints. Officer Pounds

said that the footprints appeared to be fresh because of the moisture in the dirt. He also said that all the footprints in the backyard appeared to come from the same pair of shoes.

Following Officer Pounds's testimony, the trial court read a stipulation into the record for the jury. The stipulation noted that the evidence sent for testing matched the DNA of Paula Fowler and her son. It also stated that no other individual's DNA, including Todd's DNA, was found at the scene of the crime.

Linda Littlejohn, a Special Agent for the Tennessee Bureau of Investigation, was accepted as an expert in the area of shoeprint or footwear impression. She testified that she examined the shoeprint impression from the scene of the crime and compared those impressions to Todd's shoes that had been submitted. She determined that the tread pattern from the shoeprint impressions was "totally inconsistent" with the tread pattern on Todd's shoes that had been submitted. In addition, Special Agent Littlejohn was unable to determine the size of the shoe from the impressions collected because they did not contain a complete tread pattern.

Dabney Kirk, a Special Agent with the Tennessee Bureau of Investigation, was accepted as an expert in the area of latent fingerprints. He said that one brick and several pieces of bricks and a piece of plastic wrapping were submitted for fingerprint testing, but he was not able to collect any latent fingerprints. Special Agent Kirk said that he was not surprised that he was unable to find any prints because the brick and the brick pieces had a surface that was very rough.

Robert Wilkie, a detective with the Memphis Police Department, testified that he was assigned to work on this case on June 18, 2006. As a part of his investigation, he talked with Paula Fowler and her son and contacted the crime scene investigators to ensure that they had fully processed the scene. On June 29, 2006, Detective Wilkie showed Paula Fowler a spreadsheet that did not contain a picture of Todd. He said that the first photo spread was for the purpose of eliminating possible suspects. Paula informed him that her perpetrator was not on the first photo spread. On July 24, 2006, he showed Paula a second photo spread that contained a photo of Todd, who had been identified as a suspect through a crime stopper's tip. Paula looked at the second photo spread and indicated that she believed that Todd was her attacker. However, she declined to positively identify him because the photograph was an old picture, and was not absolutely certain that he was the perpetrator. On July 25, 2006, Detective Wilkie showed Paula Fowler a third photo spread. During the presentation of the third photo spread, Paula immediately focused on Todd's picture and told him that she was "eighty percent sure" that he was her attacker because "she was starting to get sick to her stomach." Detective Wilkie noted that at the time of the second and third photo spreads, Todd had never been identified in the media as a possible suspect.

Detective Wilkie then testified similarly to his testimony from the suppression hearing regarding Todd's interview and subsequent arrest. Detective Wilkie read Todd's written confession to the jury, which stated in pertinent part:

Q.    On Sunday, June 18, 2006, Paula Fowler and [her son] were assaulted. Are you the person responsible?

A.    Yes.

. . . .

Q.    Who was with you when they were assaulted?

A.    Me and Charles Fowler.

Q.    Did you have any type of weapon?

A.    I had a brick.

Q.    Where did you get the brick?

A.    Charles had it in his truck already.

Q.    Did Charles Fowler have a weapon?

A.    Yes.

Q.    What type of weapon did Charles have?

A.    He had something like a forty cal[iber] and a thirty-eight [caliber] Derringer – you can shoot it two times.

Q.    In your own words, tell what happened before, during, and after the assault.

A.    He came and picked me up from my house around 9:00 or 10:00 Sunday morning. We was just riding around at first, and he had took me and bought me some drugs. He probably bought me a hundred dollars worth, and I was smoking and he was drinking.

-13-

First he told me that he wanted to go to Memphis and get some clothes out of his house because he was fixin' to leave.

We parked behind the house and walked around to the front door – so, he took me to her house. We went inside, and he brings the brick in.

And then when I got in the house, I got scared because he asked me to knock his wife out, and then he was going to come in there and shoot her. He told me that when we got in the house – and then he told me that he wasn't going to leave Memphis until it got done. It was like him having the guns, and if I didn't do it, then we were all going to die.

And we were sitting in the front room. He had the key, and when his wife and son pulled up, he gave me the brick and the stocking. So, I put it on, and he made me go upstairs and to go in his son's room, and he was going in their bedroom.

And when I got upstairs, it just so happened that they came into her son's room, and was in their bedroom with the two pistols.

When she put him down in the bed and turned around and I was just standing behind the door, and she seen me, and she got to hollering, and it scared me. And I was trying to tell her that he was in the house but I couldn't because he had those guns.

When she got to hollering, I went up to her, and I hit her a couple of times. The little boy jumped up, and when I was swinging the brick, I guess that he was trying to cover his mother up, and I hit him. But I don't know how many times I hit him. I just wanted Charles to see some blood so he would know I had done it.

I ran down the stairs, and Charles still had his guns, and Charles asked if I killed her, and I told him no.

When I turned to come out of the room, he was standing in the doorway watching, and he said, "Come on," so we ran. We ran to the truck. We went out the door and ran through the backyard. We hopped one fence and got in the truck and went back to West Memphis.

-14-

He dropped me off, and the next thing I heard, he had killed himself.

He just said, on our way home, that the police would come looking for him.

Q. Where were Paul[a] Fowler and [her son] [w]hen you left?

A. They were on the floor of the kid's room.

Q. Is there anything you wish to add to your statement which will aid this investigation?

A. I would first like to say to his wife and his son and his family members that I was put in a situation that I really couldn't get out of without doing something or dying myself. I'm sorry [about] what happened to his wife and son. I am a drug addict, and he used it against me, and I throw myself upon the mercy of the courts and the family.

I have told the truth about everything. I only ask for your leniency because I haven't ever done anything like this, and I was caught up in a situation that we would have all died if I didn't do something. I tried to tell her, but he would have killed us all if I did. I just want to tell them all I am sorry.

I am not no killer or wife beater or a kid beater.

Detective Wilkie reiterated that according to Todd's statement, Charles Fowler was in Paula Fowler's bedroom, rather than in the child's closet, at the time of the attack. Moreover, he said Todd never indicated that Charles Fowler made any actual threats to him. Detective Wilkie said that Todd told him that Charles Fowler had guns at the time of the offenses, but Todd "never said anything about him pointing [the gun] at him or anything like that." He confirmed that Todd never said he tried to prevent this crime from happening, to call for help, or to get away. Detective Wilkie identified Todd at trial as the individual who made the aforementioned written statement.

## ANALYSIS

**I. Motion to Suppress.** Todd argues that his statement should have been suppressed because it was not given knowingly, voluntarily, and intelligently. First, he claims that he did not feel free to leave the interview room because he was shackled to the table. Second,

he argues that his claims of innocence were rebuffed by the detectives, who inundated him with photographs from the crime scene. Third, he asserts that no officers advised him of his Miranda rights even though the police obtained a warrant for his DNA sample. Fourth, he argues that the detectives threatened him with a sentence of 100 years if he did not confess. Fifth, he asserts that he did not sign a waiver of his Miranda rights until after he had given his statement. Sixth, he claims that he did not read his written statement which was typed by the detectives.

In response, the State contends that the trial court properly denied the motion to suppress Todd's statement after determining that he had waived his right to counsel and his right to remain silent. In addition, the State argues that the court accredited the officers' testimony and determined that Todd's testimony regarding his statement was "unbelievable."

"On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress." State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). In conducting our review, it has long been settled that "[f]indings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against his findings." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996) (quoting State v. Adams, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). In addition, the Tennessee Supreme Court has stated:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23. The courts of this state have concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)).

We conclude that the trial court properly denied the motion to suppress Todd's statement. The court accredited Detective Wilkie and Detective Chatman's testimony regarding the statement and determined that Todd's testimony was "unbelievable" and

"totally incredible." The court further determined that Todd gave his statement freely and voluntarily and never indicated to the officers that he wanted to speak with an attorney during the interview process. Accordingly, we conclude that the evidence in the record does not preponderate against the trial court's findings.

**II. Victim's Testimony about Prior Identification of Todd at Preliminary Hearing.** Todd argues that the trial court erred in allowing Paula Fowler to testify that she had made a prior in-court identification of Todd as the perpetrator at an earlier hearing. He contends that this testimony regarding the prior in-court identification violated his right to due process. Todd further asserts that the victim's identification during the prior hearing could have been influenced by the fact that the positive identification took place after "two failed photo line-ups" containing his photograph. Finally, Todd argues that Paula's prior in-court identification was not reliable pursuant to Neil v. Biggers, 409 U.S. 188, 199 (1972).

The State first responds by arguing that Todd waived this issue because he failed to include this issue in his motion for new trial. In any event, the State contends that Todd has failed to establish that the trial court's actions amount to plain error in this instance.

Here, Paula Fowler testified at trial that she appeared in General Sessions court for a hearing related to this case, although she did not testify. Defense counsel requested a bench conference and objected to this line of questioning because Paula Fowler's testimony constituted "an in-court identification." The court stated, "Well, prior identification doesn't necessarily have to be in court under oath. It can be identification at a live lineup – identification at a seated hearing like they do a lot of times in General Sessions." The court further stated, "[P]rior times that [Paula Fowler had] seen [Todd] is relevant to her being able to identify him. She saw him at the hearing, and yet she didn't testify. Does that mean that she can't say she saw him at the hearing? I think that's – I don't think [her testimony is] unfair. She is subject to cross-examination." The defense asked for a recess after direct examination so that he could determine what he wanted to ask Paula Fowler about her identification of Todd as the perpetrator at the hearing in General Session.

We agree that Todd has waived this issue because he failed to include it in his motion for a new trial. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Tennessee Rule of Appellate Procedure 3(e) states, in pertinent part, that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was

specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Because this issue, if found to be meritorious, would result in a new trial, Todd's failure to include it in his motion for a new trial results in waiver. State v. Keel, 882 S.W.2d. 410, 416 (Tenn. Crim. App. 1994).

Since Todd has waived this issue, we may only review it for plain error. See T.R.A.P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). In State v. Adkisson, this court stated that in order for an error to be considered plain:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (citations omitted). All five factors must be shown, and it is unnecessary to consider each factor if it is obvious that one of the factors cannot be established. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Our analysis of this issue is based upon the United States Supreme Court holdings in Simmons v. United States, 390 U.S. 377 (1968), and Neil v. Biggers, 409 U.S. 188 (1972). In Simmons, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384. In Neil v. Biggers, the Court established a two-part analysis which the trial court must apply to determine the validity of a pre-trial identification. 409 U.S. at 198-99. First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. Next, if the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199. In Tennessee, it is unnecessary to apply the totality of the circumstances test described in Biggers if the identification procedure was not unduly suggestive. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

-18-

Based on our review of the record, we conclude that there was nothing unduly suggestive about the photo spreads containing Todd's picture or the overall identification process. The second photo spread contained photographs of six African American males, all of whom had some facial hair. The third photo spread again contained photographs of six African American males, with five out of the six containing some facial hair. The photographs in the second and the third spreadsheets were uniform in size. Moreover, nothing about Todd's photograph in each of the photo spreads was "grossly dissimilar" to the other pictures in the photo spread. Finally, and most importantly, there was nothing unduly suggestive about Paula Fowler's identification of Todd at the November 9, 2006 hearing in General Sessions. The evidence showed that Todd was not identified in any way during this hearing. Paula stated that although she was not comfortable making an identification from a photograph, she was "one hundred percent" sure that Todd was her attacker when she saw him at this hearing. Because there was nothing unduly suggestive about the identification process, Todd has not established plain error regarding this issue because a clear and unequivocal rule of law was not breached. Accordingly, Todd is not entitled to relief on this issue.

**III. Admission of Photographs.** Todd argues that the trial court erred in admitting photographs that had been pre-marked outside the presence of the jury because the photographs were not properly authenticated. He further argues that the prejudicial effect of the challenged photographs substantially outweighed their probative value.

In response, the State initially asserts that Todd has waived this issue because he agreed to the process of pre-marking the photographs as exhibits. Waiver notwithstanding, the State argues that the Officer Pounds properly authenticated the photographs because he testified that he physically took the photographs. In addition, the State asserts that Todd failed to identify the particular photographs that he found objectionable on appeal. Finally, the State argues that the trial court did not abuse its discretion in finding that the probative value of the photographs substantially outweighed any prejudicial effect.

Here, during a jury-out hearing, the court requested that the State premark the photographs that would be admitted through Officer A.J. Pounds, the crime scene officer. The following exchange occurred:

The Court: It would really expedite matters if you could premark some things – if there are any objectionable photographs, I guess we ought to settle that, but –

[The State]: Okay.

-19-

The Court:    If you feel like these are going to be entered into evidence, [Defense Counsel], it would expedite matters if we would just go ahead and premark them and agree they will be marked in as evidence. That way it will save a lot of time walking back and forth tendering the photograph as an exhibit and her asking foundation questions such as, "Does it fairly and accurately represent the scene," on each photograph. I think it would help out. But I'll give you all time to look through those.

Following a lunch recess, Todd was brought into the courtroom. The parties informed the court that the defense had objected to the photographs with the yellow stickers. Defense counsel made a Rule 403 objection to three photographs of the child's bedroom that depicted pools of blood and smears of blood and argued that these photographs were cumulative. The court ruled that the State had to present these photographs to present the room in its entirety. The court also determined that some photographs were necessary to show the position of the closet in the room as well as the "severity of the attack" which related to "intent" and "premeditation" and established that this crime "could very well be an attempted murder one rather than just a simple assault." Accordingly, the trial court determined that the "probative value [of these photographs] . . . substantially outweigh[ed] any unfair prejudice."

The next photograph depicted "some blood spatter on the wall and the [blinds]." Defense counsel objected to this photograph on the basis that it was cumulative. The State argued that this photograph showed the "complete saturation of what appeared to be blood" on the bed ruffle, sheets, and comforter and appeared to show that the child had just gotten out of bed. The court ruled that the "probative value does outweigh . . . any prejudicial effect at all."

The next photograph showed placards identifying objects on the floor. The court ruled that "it does point out the fact that there are objects and not just blood [spots] on the floor, so I'm going to allow that."

The next photograph depicted a dresser in the child's room. The defense objected on the basis that the picture was cumulative, since the dresser had appeared in an earlier photograph. The court noted that the photograph showed a clump of hair that was not visible in the other photograph. The State also argued that the photograph also showed some small pieces of brick and an earring. The court determined that the picture was "not inflammatory" and was not "unduly prejudicial."

The next photographs showed placards 11 and 18, which identified pieces of broken brick. The court ruled that "the jury should be entitled to see the scene as it was at the time" and the photograph "goes to the severity [of the attack]."

The next photograph showed a piece of Paula Fowler's scalp that was lost during the attack. The court stated that "the state has the burden of proving the case beyond a reasonable doubt, and this photograph is not inflammatory." Ultimately, the court ruled that the photograph was admissible.

The next photographs showed pieces of broken bricks and pieces of the victim's scalp that was lost during the attack. The court again ruled that "the state has the burden of proving this case beyond a reasonable doubt" and that the pictures were "not inflammatory in any way" The State also voluntarily withdrew three other photographs to which the defense had objected.

The State explained to the trial court that although there were thirteen C.D.'s of pictures made with forty to fifty pictures on each C.D., it did not develop all of these pictures. The State added that it attempted "to avoid duplication" with the photographs that it sought to introduce. The court took a short recess so that the photographs that it had determined were acceptable could be premarked.

Once court resumed, the court had the following discussion with the parties:

| | |
|---|---|
| The Court: | All right. All the next exhibits have been premarked. The photographs, I pretty much have indicated – at least I thought I did – that as far as I'm concerned these are in evidence. But it you wish to move them into evidence without too much formality, you may do so for the sake of the jury. |
| [The State]: | Yes, Judge. |
| . . . . | |
| The Court: | Okay. So, starting at [Exhibit No.] 3 [and] going all the way through Exhibit 53. So, there's fifty exhibits that have been premarked? |
| [The State]: | Yes. |

-21-

. . . .

| | |
|---|---|
| The Court: | So, any of the items that have been tagged that you find particularly objectionable at this time? |
| [Defense counsel]: | Your Honor, we don't have any objections to any of the photographs with the exception of the ones we obviously mentioned – we've already done that, so we should be able to go through these rather smoothly and quickly. |
| The Court: | So, it's fair to say that I can assume that all of these things are in evidence? |
| [Defense counsel]: | Yes, Your Honor. |

. . . .

| | |
|---|---|
| The Court: | – [S]ome of the bloody photos, you were objecting to as being cumulative or – . |
| [Defense counsel]: | And we will remain silent when they're presented, and we rely on our former objections. |
| The Court: | Okay. Very good. |

. . . .

| | |
|---|---|
| [Defense counsel]: | Your Honor, I would ask for Your Honor to explain to the jury what we've done. We've tried to expedite it, and we're agreeable to do that. |
| The Court: | Very good. |

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951).

However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Upon review of the record, we agree with the State that these photographs were properly authenticated by Officer A.J. Pounds. Therefore, any argument regarding the authenticity of the photographs is moot. In addition, there is nothing gruesome, graphic, or horrifying about these pictures. Compare Banks, 564 S.W.2d at 950-51 (citing People v. Jenko, 410 Ill. 478, 102 N.E.2d 783 (1951)) ("[P]hotographs of [a] corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character."). Furthermore, nothing in the photographs would confuse or mislead the jury, waste the court's time, or be redundant. See Tenn. R. Evid. 403; see also Banks, 564 S.W.2d at 951. After reviewing the record, we conclude that the trial court did not abuse its discretion in admitting these photographs.

**IV. Jury Instruction Regarding the Defense of Duress.** Todd argues that the trial court improperly expanded the Tennessee Supreme Court's holding in Leach v. State, 42 S.W. 195, 197 (Tenn. 1897), to apply to non-homicide cases. He claims that since he was charged with two "non-homicide" offenses, the additional language in the special jury instruction was error and prejudiced him.

In response, the State contends that Todd was not entitled to the defense of duress pursuant to Leach because Todd should have used the brick to attack Mr. Fowler, who was "allegedly armed," rather than Ms. Fowler, who was "unarmed and defenseless." In addition, it argues that the phrase added by the trial court to the jury instruction on duress did not materially alter the instruction. Instead, the State asserts that the court's addition of the phrase "or where the defendant had conspired with another person to commit the crime" follows the reasoning in Leach that a defendant may not use the defense of duress where he places himself in a situation where he might be forced to commit a criminal offense. Moreover, it argues that the phrase was not an incorrect statement of the law because there are no Tennessee cases that allow a defendant to enter a conspiracy and then raise the defense of duress. Citing Mallicoat v. State, 539 S.W.2d 54, 57 (Tenn. Crim. App. 1976), the State contends that even if this court concludes that the addition of the phrase to the jury

instruction was improper, the error was harmless because Mr. Fowler's threat against Todd at the time of the offenses was not "continuous," or "present, imminent, and impending."

Tennessee Code Annotated section 39-11-504 defines the defense of duress:

(a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

(b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Here, following the close of proof, the State requested that the court add language to the jury instruction regarding the defense duress based on Leach v. State, 42 S.W. 195 (Tenn. 1897). In Leach, the Tennessee Supreme Court held that duress is not a defense where the defendant conspired with another person to commit the murder. Id. at 197. The defense argued that the additional language was unnecessary, given that the pattern jury instruction on duress included language that the defense of duress was "unavailable to a person who intentionally, knowingly, recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion." The court responded, "Being involved in a situation where it's probable a person would be subjected to compulsion is different than stating that . . . if the defendant . . . had conspired to commit murder . . . he can't then claim duress." The court determined that it was proper to have the jury instruction include the additional language from Leach, and the defense asked that the court note its objection for the record. The court later provided the following instruction, which included the language from Leach as emphasized, to the pattern jury instruction regarding the defense of duress:

This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion or that the defendant conspired with another person to commit the crime.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. It follows that a defendant

-24-

also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (quoting Harbison, 704 S.W.2d at 319). There is no requirement that a trial court be limited to using pattern jury instructions. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In addition, special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). The refusal to grant a special request for instruction is error only when the general charge does not fully and fairly state the applicable law. Id. On appellate review, a jury instruction must be considered in its entirety and read as a whole rather than in isolation. Leach, 148 S.W.3d at 58.

Todd argues that the court improperly expanding the holding in Leach to non-homicide cases. In Leach, the defendant appealed the trial court's refusal to provide the following instruction to the jury: "If the proof shows that the defendant . . . entered into a conspiracy to kill [the victim], but afterwards abandoned his purpose, and was forced to kill him in order to save his own life, he would not be guilty of murder in the first degree." Id. at 197. In reviewing this issue, the Tennessee Supreme Court held:

> If it be true that one of his co-conspirators was near by with a gun, and in a threatening attitude towards the defendant, as the confession may indicate, that would work no diminution of his offense. In such a case, if in fact a real one, it was his duty to spare [the victim], and at the same time protect himself by turning his weapon upon his threatening confederate. He could not with any degree of legal palliation elect a course absolutely safe to himself, and slay an innocent man, rather than take some risk to himself in an equal combat with a relentless companion.

Id. In Mallicoat, 539 S.W.2d at 57, this Court upheld Leach and cited other authorities for the same proposition. The court quoted with approval the following statement from AMERICAN JURISPRUDENCE regarding coercion and duress:

Though coercion does not excuse taking the life of an innocent person, it does excuse most, if not all, other offenses. In order to constitute a defense, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. Apprehension of loss of property, or of slight or remote personal injury, is no excuse. Furthermore, the danger must be continuous throughout the time when the act is being committed and must be one from which the defendant cannot withdraw in safety. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. And threat or fear of future injury is not sufficient.

Id. (quoting 21 AM. JUR. 2D, Criminal Law § 100). The Mallicoat court also quoted with approval the following language from the treatise CORPUS JURIS SECONDUM:

While the rule has no application in the case of homicide, and compulsion cannot excuse taking the life of an innocent man . . . in general an act which would otherwise constitute a crime may be excused on the ground that it was done under compulsion or duress, since the necessary ingredient of intention . . . is then lacking.

The compulsion or coercion which will excuse the commission of a criminal act must be present, imminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done; it must be continuous, and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough, particularly after danger from the threat has passed. . . .

Id. (quoting 22 C.J.S. Criminal Law § 44).

Todd specifically argues that the additional language in the jury instruction prejudiced him because he was being tried for two "non-homicide" charges, namely attempted first degree murder and aggravated assault, rather than a murder charge. However, the record contains ample evidence showing that Todd entered into a conspiracy with Charles Fowler to kill his wife and child. The evidence showed that Todd intended to kill Paula Fowler when he struck her in the head more than forty times with a brick. Todd's failure to succeed in killing Paula Fowler should in no way prevent the application of Leach. We agree with the State that, pursuant to Leach, Todd should have used the brick to attack his co-

conspirator, Charles Fowler, rather than attack Paula Fowler, who was innocent and defenseless.

Moreover, Todd was not entitled to the defense of duress because Charles Fowler's alleged threat against him was not "continuous", or "present, imminent, or impending." In the written statement to police, Todd asserted that Charles Fowler was in Paula Fowler's bedroom, rather than beside him in the child's closet, at the time of the attack. Todd never said that Charles Fowler directly threatened him if he did not commit the crimes. In addition, Todd never indicated that Charles Fowler aimed a gun at Todd to ensure that Todd committed the offenses in this case. Accordingly, we conclude that the language added to the jury instruction was proper. We further conclude that, regardless of the language of the instruction, the defense of duress was not available to Todd because Fowler's threat was neither "continuous" nor "present, imminent or impending." See T.C.A. § 39-11-504; Mallicoat, 539 S.W.2d at 57.

**V. Sufficiency of the Evidence.** Todd argues that the evidence is insufficient to support his convictions. First, he claims that the evidence failed to prove that he intended to kill the victim because the evidence showed that the victim "was knowingly left alive." Second, Todd argues that he was entitled to the defense of duress because the evidence showed that Charles Fowler "would harm him and others if he did not do what he wanted [him] to do."

The State responds that the evidence was sufficient to support the convictions. It argues that the evidence established that Todd acted with premeditation and intended to kill Paula Fowler. It further argues that the jury chose to reject the defense of duress.

Todd was convicted of criminal attempt, murder in the first degree and aggravated assault. The criminal attempt statute states:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

T.C.A. § 39-12-101 (2006). First degree murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539), perm. to appeal denied (Tenn. June 14, 1999). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; West, 844 S.W.2d at 148). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

An individual commits the offense of aggravated assault when, as relevant in this case, he "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101" and "[u]ses or displays a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(B) (2006). The assault statute states:

(a) A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Id. § 39-132-101(a) (2006).

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the jury as the trier of fact, and this court does not re-weigh

or re-evaluate the evidence. Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)), perm. to appeal denied (Tenn. Dec. 27, 1999). This court has stated that the identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982), perm. to appeal denied (Tenn. June 21, 1982)). In addition, as relevant here, this court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

The evidence was more than sufficient to support Todd's convictions for attempted first degree murder and aggravated assault. Todd signed a written statement confessing to the crimes in this case. Paula Fowler identified him as the perpetrator at an earlier hearing and at trial. She also testified that Todd hit her forty times in the head with a brick within a span of five minutes and hit her son three times in the head with this brick. Both Paula Fowler and Morgan Myers placed Todd alone at the scene of the crimes. Ashley Fowler testified that her father and Todd were "plotting something[.]" Although Todd presented a defense of duress at trial, the jury was free to determine that he was not entitled to this defense. We will not "reweigh or reevaluate the evidence." Bland, 958 S.W.2d at 659. Accordingly, Todd is not entitled to relief on this issue.

**VI. Sentence.** Todd argues that the trial court imposed an excessive sentence. Specifically, he challenges the length of his sentence and the imposition of consecutive sentences. The State responds that Todd's sentence was proper.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (1997). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing the impropriety of the sentence. Sentencing Comm'n Comments, T.C.A. § 40-35-401(d) (1997). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court may not disturb the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In a case where "the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." Carter, 254 S.W.3d at 345 (citing State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992), perm. to appeal denied (Tenn. March 22, 1993)). Because it appears that the trial court properly applied the enhancement factors, because no mitigating factors applied, and because the court followed the purposes and principles of the Sentencing Act, our review is de novo with a presumption of correctness. See id. at 345-46; Ashby, 823 S.W.2d at 169.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006).

**A.** **Length of Sentence.** Todd contends that the trial court erred in applying enhancement factor (5), "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[,]" and enhancement factor (6), "[t]he personal injuries inflicted upon . . . the victim was particularly great[.]" See T.C.A. § 40-35-114(5), (6) (2006). Citing State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001), he argues that the trial court erred in applying the exceptional cruelty factor to his two convictions because the court "seemed to focus upon the longstanding impact of the crime on the victims rather than which acts of the defendant were over and above what is required to establish the offenses of [attempted] premeditated murder and aggravated assault." In addition, citing State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994), he argues that the trial court erred in applying the particularly great personal injuries factor because there was no proof of injuries beyond that necessary to commit the offense. In response, the State argues that Todd's criminal history alone was sufficient to sentence him to the maximum sentence for his conviction.

Here, the trial court found that the following enhancement factors were applicable under Tennessee Code Annotated section 40-35-114 in counts one and two of the indictment:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

. . . .

(5) The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense;

(6) The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great;

. . . .

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]

T.C.A. § 40-35-114 (1), (2), (5), (6), (8) (2006).

The trial court found that the following enhancement factor was applicable to count one:

> (9) The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense[.]

Id. § 40-35-114(9) (2006).

The trial court found that the following enhancement factor was applicable to count two:

> (4) A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]

Id. § 40-35-114(4) (2006). The defense did not present any mitigating factors for the trial court's consideration.

Although the trial court applied the aforementioned enhancement factors, Todd only challenged the court's application of factors (5) and (6). Regarding factor (1), Todd's "previous history of criminal convictions or criminal behavior," the State entered certified copies of Todd's convictions in Arkansas, which included felony convictions for aggravated assault and theft. Todd also had a pending felony case in which he was charged with possession of drugs with intent to sell and had posted bond on this case one month prior to committing the offenses in this case. Todd also had misdemeanor convictions for possession of drugs and disorderly conduct.

Regarding factor (5), that Todd "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," the trial court noted that "an element of the offense [is not] that you get beat with a brick countless times to where you can't even count the number of blows." The court added the following:

> [Todd] rendered all of these blows [to Paula Fowler] and . . . rendered blows to a three year old, both of whom . . . have survived this and are going to have to live with this for the rest of their lives. The exceptional cruelty is mind boggling. It's beyond description.
>
> The poor boy. There's not even words that can describe how cruel this was. And particularly when the defendant reached over to see if the victim

-33-

was breathing and how frightening and appalling. It must have been ungodly for the victim of the criminal attempt first degree murder to know that he is – that there might be some more whacks coming because he might have detected I am breathing. I know she testified that she faked like she was dead. And it was luck for her. If she had kept up a struggle she might not have survived this.

And I think that Number 5, I put tremendous amount of weight on that. This was cruel. I've never seen since I've been here anything more cruel that this.

The Tennessee Supreme Court has held that evidence supporting the application of the "exceptional cruelty" enhancement factor must "'denote[] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged.'" Arnett, 49 S.W.3d at 258 (quoting State v. Haynes, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App., at Jackson, Mar. 14, 2000)). We conclude that the trial court properly applied factor (5) in this case.

Regarding factor (6), that "[t]he personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great," the trial court stated:

I think the personal injuries upon both of them – I mean, the [conviction] for criminal attempt first degree murder especially – I mean, it could have been one gunshot wound but it's not an element of the offense. I think the personal injuries as far as Count 1 are great. I saw the damage that was done and also the suffering that still goes on. I believe there will be no repairing this.

You can live. You will exist. But, you know, every[]time you come home at night . . . you'd have to worry about whether or not the boogy man is in the closet. That's horrible. So I think – I think it does not apply to aggravated assault because I think it's too closely related to the elements of the offense but criminal attempt first degree murder I believe Number 6 applied.

Later, the trial court reconsidered and applied enhancement factor (6) to the aggravated assault conviction because count two of the indictment charged Todd with committing an assault through the use or display of a deadly weapon rather than committing an assault that caused serious bodily injury to another. See id. § 39-13-102(a)(1)(A), (B) (2006). This court has previously held that "[t]he term 'personal injury' [as stated in enhancement factor (6)]

-34-

is broad enough to embrace the severe emotional injuries and the psychological scaring that the victim has suffered and will continue to suffer as a result of the appellant's actions." State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994). We also conclude that the trial court properly applied factor (6) in this case.

After applying the aforementioned enhancement factors, the trial court imposed a twenty-five-year sentence for the attempted first degree murder conviction and a consecutive ten-year sentence for the aggravated assault conviction. The trial court stated although it sentenced Todd to the maximum sentence in his range, he felt that the sentences were not lengthy enough given the severity of the crimes.

Because the offenses in this case occurred on June 18, 2006, the 2005 amended sentencing act governs this case. Under the amended sentencing act, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors." State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008) (quoting T.C.A. § 40-35-210(c) (2006)). Moreover, under the new law "[a]n appellate court is . . . bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346. The Tennessee Supreme Court explained the impact of the 2005 amended sentencing act:

> The amended statute no longer imposes a presumptive sentence. Rather, the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." Id. § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," id. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," id. § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," id. § 40-35-103(5).

Id. at 343 (internal footnote omitted). The court also emphasized the broad discretion the trial court has in sentencing a defendant under this act:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not

increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

Id. at 345-46.

We initially note that the defendant has the burden of showing the impropriety of the sentence. See T.C.A. § 40-35-401(d) (2006), Sentencing Comm'n Comments. Despite Todd's arguments to the contrary, we conclude that the trial court properly applied enhancement factors (5) and (6) in this case. Upon review, we conclude that the record fully supports the trial court's imposition of a twenty-five year sentence for the attempted first degree murder conviction and a ten-year sentence for the aggravated assault conviction. Accordingly, Todd is not entitled to relief on this issue.

**B. Consecutive Sentence.** Todd also argues that the trial court erred in imposing a consecutive sentence. First, he asserts that the trial court erroneously applied the factor that he was a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood because no proof was presented "reflecting the amount of money that the defendant derived from prior criminal offenses." See T.C.A. § 40-35-115(b)(1) (2006). Second, he argues that the trial court erroneously applied the factor that Todd was a dangerous offender. See id. § 40-35-115(b)(4) (2006). He contends that the trial court applied the dangerous offender factor primarily based on the circumstances surrounding the offense and further argues that an inherently dangerous crime does not justify consecutive sentences in light of the more severe penalties for these crimes. In response, the State contends that the trial court properly applied these factors in sentencing Todd to a consecutive sentence.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Id. § 40-35-115(a) (2006). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2).

Here, the trial court determined that consecutive sentences were proper based on the following factors:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

Id. § 40-35-115(b)(1), (4) (2006).

Here, the trial court, in applying the professional criminal factor, found that Todd would not have agreed to kill a woman and her child unless he was "[de]void of any consci[ence]." In addition, the presentence report establishes that Todd had a poor history of employment. Moreover, Todd's criminal record indicated that his only source of income, especially at the time of the offenses in this case, was from criminal acts. Accordingly, we conclude that the trial court properly applied this factor.

Regarding the dangerous offender factor, the court also determined that Todd was "about as dangerous a man as there has ever been." The court further stated, "[T]he main reason why I think it has to be consecutive is just based upon the facts of this case alone, the circumstances surrounding the commission of the offense are particularly aggravated." Finally the court made the following statement regarding this factor:

> I think [Todd] is a dangerous offender. Based not only on the facts of this case but also he's shown that to be true in his life as well as in his record and his previous dealings with the law. And I think it's necessary to protect society from his unwillingness to lead a productive life. And definitely anyone that would do this would be anti-social. And he's leading an anti-social life-style.

We conclude that the trial court properly ordered consecutive sentencing regarding the dangerous offender factor as well. Regarding this subsection, the Tennessee Supreme Court has stated:

> Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive

-37-

sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. <u>The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.</u>

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995)) (emphasis added). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" factor because it is "the most subjective and hardest to apply." Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

The record shows that the trial court properly applied the professional criminal and dangerous offender factors in ordering consecutive sentencing. Accordingly, we conclude that the trial court did not err in ordering consecutive sentencing in this case.

## CONCLUSION

The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE